## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.  09-80104--CR–RYSKAMP/HOPKINS

UNITED STATES OF AMERICA,

      Plaintiff,

v.

BOBBY LEE FREEMAN,

      Defendant.

_____/

### REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS CUSTODIAL STATEMENT (DE 43), DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (DE 41), DEFENDANT'S MOTION TO SUPPRESS ALL EVIDENCE DERIVED FROM JAIL TELEPHONE CALLS (DE 46), AND DEFENDANT'S MOTION IN LIMINE TO EXCLUDE JAIL TELEPHONE CONVERSATIONS AND TRANSCRIPTS (DE 47)

**THIS MATTER** is before the Court on reference from Senior United States District Judge Kenneth L. Ryskamp. (DE 49.) Before the Court is Defendant's Motion to Suppress Custodial Statements (DE 43), Defendant's Motion to Suppress Evidence (DE 41), Defendant's Motion to Suppress All Evidence and Fruits Derived from Illegally Intercepted Jail Telephone Calls (DE 46), and Defendant's Motion in Limine to Exclude Jail Telephone Conversation and Transcript (DE 47). The United States responded to the motions. (DEs 66-68.)  The Court held hearings on Defendant's motions on February 9, 12, and 22, 2010.  Now, having fully considered the parties' arguments and evidence, and considering the governing law, the Court RECOMMENDS that the motions be denied as discussed below.

1

## BACKGROUND

The Court makes the following findings of fact:

On September 15, 2009, the Defendant was indicted on one count of being a felon in possession of a firearm and ammunition, which carries a mandatory minimum sentence of fifteen years to life imprisonment because Defendant allegedly is an armed career criminal.  (DE 6).

At the hearings FBI Task Force Agent David Wilson, FBI Supervisory Special Agent Michael Donohoe, Martin County Deputy Sheriff Anthony Clyde Grillo, Palm Beach County Sheriff Agent Darren Stinnett, FBI Task Force Agent Paul Bruno, FBI Special Agent John J. McVeigh, IV, Defendant Bobby Lee Freeman, FBI Special Agent Gavin Gumbiner, Willie Nicholson, and Martin County Deputy Sheriff Steven Winegard testified (DEs 81, 83, 84).

The Indictment arises out of a September 3-4, 2009, surveillance, stop and search of a vehicle that Defendant was a passenger in, and the recovery of an Amadeo Rossi .38 caliber revolver with 6 rounds of ammunition.  The FBI had received information from a confidential informant (CI) that the Defendant, a convicted felon, was part of a group that was going to be leaving Palm Beach County on September 3, 2009, to commit armed robberies.  The CI advised the agents that a pistol was hidden above the glove compartment in the van.

On September 3, 2009, a tracking device was put on the vehicle, a Chevy van, while the Defendant was at a grocery store in Belle Glade. (DE 81, pgs. 12, 76).  The tracking device was only giving the agents general location information for the van, so the agents would periodically lose sight of the vehicle.  In the early morning of September 4, 2009, the agents observed the van at a gas station in Riviera Beach.  The van was next observed at a truck stop near State Road 70 in Fort Pierce.  Then the van proceeded to another truck stop on Kings Highway about a mile up the road.

The Defendant was observed leaving the convenience store without carrying any packages.  No gas was pumped there.

The van then proceeded to a very large truck stop in Vero Beach.  The van parked in a large parking lot very far from gas station and convenience store, even though closer spots were available.  One of the occupants of the van was seen leaving the convenience store without carrying anything.  The van then proceeded to two nearby gas stations, where they did not pump any gas.

At about 6 a.m. they then proceeded to a closed outlet mall in Vero Beach.  They then went back south on I95 and stopped at another gas station, on Kanner Highway.  The van then proceeded westbound on Kanner Highway at speeds over 80 mph.  The agents called for Martin County Sheriff's Office to conduct a traffic stop.  At about 7:30 a.m. Martin County road patrol Deputy Grillo received a call from dispatch to assist the FBI.  He was advised that 3 black males had been casing convenience stores and they were possibly armed.  The van went by him traveling at about 85 mph.  Deputy Grillo chased the van, activated his blue lights, but the van did not immediately pull over.  He then activated his siren but the van did not immediately pull over.  When the van pulled over, another deputy pulled along side Deputy Grillo's vehicle.  The stop occurred at about 7:41 a.m.  Deputy Grillo exited his patrol car with his gun drawn.

 The driver of the van was Willie Nickelson.  The Defendant was in the front passenger seat. Deputy Grillo had the 3 males step out of the van and raise their hands.  He had them walk backwards to the patrol car where they were put in handcuffs.  The occupants were put into the patrol cars.  They ran the names of the occupants.

The FBI arrived on scene.  FBI Agent Gumbinner went to the back of a patrol car and asked the driver of the van and asked him for consent to search the vehicle.  The driver said the van didn't

3

belong to him.  The driver said it was not his vehicle and so he could not give consent.  When the driver was advised that he had care and custody of the vehicle so he could give consent, the driver said that he did not want to do that and said that he wanted his attorney.  (DE 83, pg. 7).

Running the names of the occupants took about 15 minutes.  Once it was determined that there were no outstanding warrants, the occupants were removed from the patrol cars and their handcuffs were removed.  The driver was issued a warning citation.

Agent Gumbinner approached the Defendant at the rear of one of the patrol vehicles.  The Defendant was not handcuffed and escorted to a restroom at one point.  Agent Bumbinner asked the Defendant some biographical information in an effort to build rapport.  Then he began to ask more substantive questions.  The Defendant offered to work for the FBI.  He offered to buy drugs for the FBI.  He said that he worked for a Palm Beach County Sheriff's Deputy.  At about 8:30 a.m. Agent Gumbinner asked the Defendant for consent to search the vehicle.  He advised the Defendant of his right to refuse consent.  The Defendant gave consent but refused to sign the consent form.

Agent Wilson had called PBSO canine Agent Stinnett at about 7:30 a.m. and asked him to proceed to Kanner Highway west of I95.  Agent Stinnett, who was in Riviera Beach at I95 (approximately 30 miles away), proceeded to the van with his canine.  Once there they proceeded to do an exterior search whereupon the canine alerted and jumped into the rear of the vehicle.  The canine alerted on a plastic bag on the floor, containing marijuana residue.  The agent had the canine do another inspection and the canine alerted on the same area again.  The agent and the FBI began to search the vehicle.  The agent hit the inside of the glove box and something rattled above the glove box.

The agents obtained a screwdriver from inside the van and unscrewed the glove

4

compartment.   They lowered it and found the handgun.   Agent Gumbinner approached the Defendant again.  The Defendant asked him what he found.  Agent Gumbinner said that he wanted to speak to him about the handgun they found and that he wanted to straighten the matter out. (DE 83 pgs. 13-14).  The agent was looking for the advice of rights form when the Defendant told him that he needed protection.  When the agent asked him why, the Defendant said that he had bought the gun in Belle Glades.  Agent Gumbinner asked him to stop and went to retrieve an advice of rights form.  At about 9:15 a.m. Agent Gumbinner read the Defendant his Miranda rights and the Defendant waived his rights.  The Defendant was in the back of one of the patrol vehicles with his legs hanging out.  The agents did not have their guns drawn.  At about 9:37 a.m. another agent was brought over to witness the Defendant's waiver of rights.  The Defendant signed the *Miranda* form. The Defendant confessed that he had bought the gun and that he was a convicted felon.

The Defendant testified that he could use the van whenever he wanted to.  He testified that he plead the Fifth when asked if there were any drugs or guns in the vehicle.  The Defendant asserted that he never gave consent to search the van.  He further testified that when Agent Gumbinner found the gun and asked whose gun it was, that he again said that he plead the Fifth. However, he testified that he signed the Miranda form because he was afraid.  He said that he later admitted to the gun because one of the occupants was having an asthma attack.  His testimony was incredible.

The Defendant was arrested and has been housed at the Palm Beach County jail since his arrest.  Agent MacVeigh inspected the phones at the jail where the Defendant was housed.  There was a 1 and ½ by 1 foot sign two concrete blocks above the phones that read in nearly inch tall letters, "PBSO reserves the right to monitor and record conversations on these telephones."   The

Defendant also signed forms indicating that he was aware of monitoring and recording of inmate calls. (GX A,B).

Recordings and transcripts were made of the Defendant's calls at the Palm Beach County jail. (GXs B1-11). The Government played portions of the calls at the hearing. (DE 81, pgs. 202-210 ) The calls were audible and the transcripts were accurate. The tapes include statements about why the Defendant is in jail, why he allowed the search of the vehicle, why he said the gun was his, how they found the gun despite it being well hidden, how he told the FBI that he had bought the gun, why he put the gun in the compartment, how his fingerprints might be on the gun, and how he would not have signed the form if he knew the FBI was involved, . They also include a discussion about trying to get the other passenger in the vehicle to take responsibility for the gun.

The Defendant testified that he did not have his glasses during the period when those calls were made, so he could not read any sign advising him that the calls were being recorded. He also testified that although he signed receipts for the materials advising him that his calls were being monitored and recorded, he never read them. He further denied knowing that calls were being monitored even though he attempted to evade the detection of his prohibited three-way calls. The Defendant's testimony was incredible.

## ANALYSIS

### A.  The Motions To Suppress Physical Evidence and Statements (DEs 41, 43).

1. Standing

The Government concedes that the Defendant has standing to contest the validity of the stop and search of the van. (DE 68, pg. 6; DE 83, pg. 114).

2. The vehicle stop

"A traffic stop... is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with *Terry*... When determining whether an officer had probable cause to believe that a traffic violation occurred, the officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment.  The Constitution also permits police officers to conduct a brief investigatory stop, if they have a reasonable, articulable suspicion based on objective facts that' an individual is engaged in criminal activity.  A determination of reasonable suspicion is based on the totality of the circumstances, and [i]t does not require officers to catch the suspect in a crime.  Instead, [a] reasonable suspicion of criminal activity may be formed by observing exclusively legal activity.   Additionally, the issue is not whether the particular officer involved actually and subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion objectively existed to justify [the investigatory stop]." *United States v. Harris*, 526 F.3d 1334, 1338-39 (11th Cir.) (officer had probable cause to stop a taxicab because he observed the cab fail to signal during a lane change)(citations and quotations omitted), *cert. denied*, --- U.S. ----, 129 S.Ct. 569, 172 L.Ed.2d 433 (2008).

Deputy Grillo had probable cause to stop the van for speeding. *Id.*

Moreover, the traffic stop was justified by reasonable suspicion that the occupants were contemplating engaging in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968)(investigatory stop valid when police observed defendants acting in manner consistent with hypothesis that defendants were contemplating daylight robbery).  They had been advised by a CI that there was a gun hidden in the vehicle.  They knew that Defendant was a convicted felon.  They had been advised that the van occupants were going to engage in armed

robberies.  They had observed what appeared to be the van occupants casing several convenience stores in the middle of the night and then stopping at a closed outlet mall.  They had reasonable suspicion to conduct the car stop.  *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).

The car stop was not overly intrusive.  See *United States v. Hardy*, 855 F.2d 753, 759 (11th Cir.1988)(subjecting luggage in defendants' automobile to canine sniff did not exceed permissible scope of *Terry* stop; sniff was unintrusive way in which to determine whether narcotics were secreted in luggage in trunk, state trooper acted with dispatch in obtaining trained dog, and 50 minute delay did not invalidate detention).  In the instant case the officers called for the canine right before the stop, the officers had to secure three possibly armed and dangerous occupants and run their names, the canine sniffed the exterior of the van before alerting, and the delay was only about 50 minutes before the canine sniff.  The police diligently pursue their investigation.  *Hardy* 855 F.3d at 759-60.

3.  <u>The vehicle search</u>

a)  consent to search

"An officer conducting a routine traffic stop may request consent to search the vehicle." *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir.2001).  Once valid consent to search a vehicle is obtained, the clock is re-started for purposes of evaluating the reasonableness of the duration of the intrusion. *United States v. Hernandez*, 418 F.3d 1206, 1209-10 (11th Cir.2005).

Refusal to consent by third parties does not invalidate consent by the defendant. *Harris,* 526 F.3d at 1339.

"A consensual search is constitutional if it is voluntary; if it is the product of an 'essentially

8

free and unconstrained choice.' " *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir.2001) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)). Voluntariness is a question of fact based on the totality of the circumstances. *Id.* (citation omitted). The degree to which the individual cooperates with the police is a factor. *United States v. Acosta*, 363 F.3d 1141 (11th Cir. 2004) (where defendant was cooperative, consent was voluntary though officers had drawn weapons, prevented defendant from returning to his car, blocked in his car with police cruisers, kept his license for brief period, and may have had his car keys).

In the instant case, the Defendant was not handcuffed when consent was solicited. Even if he did not think that he was free to go, consent could be voluntary. See *United States v. Purcell*, 236 F.3d 1274, 1281-82 (11th Cir.) (holding consent to search voluntary despite officer's retention of operator's license and registration during traffic stop), *cert. denied*, 534 U.S. 830, 122 S.Ct. 73, 151 L.Ed.2d 38 (2001); see also *Florida v. Bostick*, 501 U.S. 429, 435-36, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (explaining that consent can be voluntary even though the detainee does not feel free to leave).

He was advised of his right to refuse consent. He had an extensive history of involvement with law enforcement and was likely aware of his right to refuse consent. He immediately offered to cooperate with the agent and advised the agent of his past cooperation. According to his taped jailhouse conversations, he did not believe that the police would find the gun in the hidden compartment. See *United States v. Crespo*, 834 F.2d 267, 271 (2d Cir.1987) (even if defendant was under arrest and handcuffed, consent was voluntary because defendant believed that police would not find contraband hidden in closet). There was no evidence of lengthy interrogation, threat of physical violence, or other coercive police behavior. Under the totality of the circumstances, the

9

consent was voluntary.  *Schneckloth v. Bustamonte*, 412 U.S. 218.

b) probable cause to search

In a case involving a dog sniff, probable cause arises when a drug-trained canine alerts to the presence of drugs. *United States v. Banks*, 3 F.3d 399, 402 (11th Cir.1993) (*per curiam*).  Thus, even if the Defendant's consent was not voluntary, there was probable cause to conduct the search.

4.  <u>The first statement</u>

The Supreme Court in *Miranda* held that "the Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during 'custodial interrogation' without a prior warning." *Illinois v. Perkins*, 496 U.S. 292, 296, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990) (citing Miranda ).  "[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689-90, 64 L.Ed.2d 297 (1980) (footnotes omitted).

In the instant case the initial statement was not the product of a custodial interrogation.  The Defendant was in the back of the patrol car with his legs hanging out.  He was not in handcuffs.  The agent's gun was not drawn.  He had not been placed under arrest.  Placing him in a patrol car did not automatically convert the *Terry* stop into an arrest.  *Thomas v. Newsome*, 821 F.2d 1550, 1554 (11th Cir.1987).

After finding the hidden gun, Agent Gumbinner said that he wanted to speak to the defendant about the handgun and that he wanted to straighten the matter out.  The agent was looking for the advice of rights form when the Defendant told him that he needed protection.  When the agent asked

10

him why, the Defendant said that he had bought the gun in Belle Glades.  This was not an interrogation.  See *Cannady v. Dugger*, 931 F.2d 752, 754 (11th Cir.1991)(no functional equivalent of interrogation where suspect spontaneously confessed to murder after police asked where suspect was on night of murder).

  5.  The subsequent statements

  The Defendant's subsequent statements were given after waivers of his *Miranda* rights.  He twice was read his *Miranda* rights and waived them.  He signed the waiver form.  He was well familiar with the criminal justice system.  All the credible evidence reflects that the waivers were knowing, intelligent, and voluntary.  See *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

  **B.**  **Defendant's Motion to Suppress All Evidence and Fruits Derived from Illegally Intercepted Jail Telephone Calls (DE 46)**

  Defendant seeks to suppress his recorded calls from the Palm Beach County Jail as being violations of the Fourth Amendment.

  Title 18, United States Code, Section 2511 *et seq.* (hereinafter "Title III") prohibits using any electronic, mechanical, or other device to intentionally intercept any wire communication unless a court order is obtained or another statutory exception applies.  Title 18, United States Code, Section 2511 *et seq.*  Once such exception is for a law enforcement agency acting in the ordinary course of his duties.  18 U.S.C. § 2510(5)(a)(ii).  A second is for consent.  18 U.S.C. § 2511(2)(c).  Either exception provides an independent basis for interceptions.  *United States v. Moore*, 452 F.3d 382, 386-87 (5th Cir. 2006).

  In *United States v. Noriega*, 764 F.Supp. 1480 (S.D.  Fla. 1991), the court upheld the interception of an inmate's telephone conversations, recognizing two applicable exceptions to Title

11

III intercepted conversations (law enforcement duties and consent).  "In the absence of any suggestion or evidence [that interception of an inmate's telephone conversations was unrelated to institutional considerations], the court must presume that recording of inmate calls was pursuant to routine prison policy applicable to all inmates" when applying the exception to Title III permitting interception by investigative or law enforcement officer in ordinary course of duties.  *Id.* at 1491.

Prison officials are "investigative or law enforcement officers" and that monitoring and recording of calls pursuant to an established and posted prison policy is in the officers' "ordinary course of duty."  *See*, *United States v. Friedman*, 300 F.3d 111, 121-22 (2nd Cir. 2002) (finding law enforcement exception applies to call routinely intercepted from county jail, but not deciding whether exception requires notice to prisoner); *United States v. Sababu*, 891 F.2d 1308, 1328-29 (7th Cir. 1989); *United States v. Feekes*, 879 F.2d 1562, 1565-66 (7th Cir. 1989); *United States v. Paul*, 614 F.2d 115, 117 (6th Cir.), *cert. denied*, 446 U.S. 941 (1980); *United States v. Vasta*, 649 F.Supp. 974, 989 (S.D.N.Y. 1986); *United States v. Clark*, 651 F.Supp. 76 (M.D. Pa. 1986); *Crooker v. United States Department of Justice*, 497 F.Supp. 500, 503 (D. Conn. 1980).  Prison officials qualify as "investigative or law enforcement officer," such that inmate calls intercepted by prison personnel need not be judicially authorized pursuant to the law enforcement exception within Title III.  *United States v. Rivera*, 292 F.Supp.2d 838 (E.D. Va. 2003).

While inmates retain a right to have a reasonable access to and use of telephones, their access is subject to rational limitations for legitimate security reasons.  *Pope v. Hightower*, 101 F.3d 1382 (11th Cir. 1996).  Judicially unauthorized monitoring and recording of an inmate's telephone calls is not prohibited where performed in the ordinary course of the prison officials' duties.  *United States v. Paul*, 614 F.2d 115 (6th Cir. 1980); *Crooker v. United States Department of Justice*, 497

F.Supp. 500 (D. Conn. 1980).

A second exception to Title III allows interception where "one of the parties to the communications has given prior consent to such interception." Title 18, United States Code, Section 2511(2)(c).  *See also*, *United States v. Hammond*, 286 F.3d 1189 (4th Cir. 2002) (defendant consented to interception of his conversations because he was notified of recording and nonetheless used the telephone).  Implied consent may be deemed where there is a sign near the telephone advising inmates of monitoring.  *See*, *United States v. Workman*, 80 F.3d 688 (2nd Cir. 1996); *United States v. Van Poyck*, 77 F.3d 285 (9th Cir. 1996); *United States v. Horr*, 963 F.2d 1124, 1126 (8th Cir. 1992) (finding that defendant implicitly consented to monitoring by using the telephone after receiving notice of monitoring);  *United States v. Feekes*, 879 F.2d 1565 (7th Cir. 1989); *United States v. Willoughby*, 860 F.2d 15, 19-20 (2nd Cir. 1988); *United States v. Amen*, 831 F.2d 373, 378 (2nd Cir. 1987).

In *United States v. Rivera*, 292 F.Supp.2d 838 (E.D. Va. 2003), the county facilities where defendant was housed routinely record all telephone conversations of every prisoner (except conversations with inmates' lawyers), and each inmate, before making a telephone call must enter an assigned identification number.  *Id.* at 839.  Further, as to one of the county facilities where defendant was housed (Arlington County Detention Center), there is a sign posted next to the phone banks, alerting the inmate that all calls may be recorded and/or monitored.  And, each inmate, after dialing his identification number hears a voice prompt informing him that the call will be recorded and monitored.  *Id.* at 840.  As to the second of the facilities in Rivera (Fairfax County Detention Center), each inmate heard the voice prompt alert that the call was being recorded, and each inmate was provided with a handbook setting forth the facility's rules which includes a section alerting

13

inmates that their telephone calls may be monitored and/or recorded.  *Id.* at 840.  The District Court in *Rivera* found that both county jail facilities' interceptions of the defendant's telephone conversations fell within both the law enforcement and consent exceptions to Title III.  *Id.* at 842. *See also*, *United States v. Hammond*, 286 F.3d 189 (4th Cir. 2002) (Bureau of Prisons was acting in the ordinary course of its duties by routinely monitoring inmate calls); *United States v. Sababu*, 891 F.2d 1308, 1329 (7th Cir. 1989) (the "ordinary course" requirement was "'clearly satisfied' where the recordings were authorized by prison regulations and were made in accordance with established prison routine").

Similarly, Florida Statute Section 934.03 provides an exemption for recording of jail calls by prison officials done so in the course of regular operations.  Consistent with the federal position and exemption under Title III,  the Florida First District Court of Appeal held "societal interest in maintaining custody over prisoners significantly outweighs individual prisoner's interest in privacy of his telephonic communications; thus, there is exception to statute governing interception of wire and oral communication permitting prison officials to wiretap telephone calls from prisoners incarcerated in prison."  *Pires v. Wainwright*, 419 So.2d 358 (Fla. 1st DCA 1982), *referring to United States v. Paul*, 614 F.2d 115 (6th Cir. 1980).  In *Pires*, the court found that although department of corrections did not post notice of intent to wiretap prisoner's telephone conversations - as there was in Paul, *supra* - legislature has clearly set forth policy placing inmates in custody under control of department of corrections, and, surveillance of prisoners by wiretapping prisoners' telephone conversations is within scope of department's duty to maintain secure correctional facility. *Pires,* at 360.  In *United States v. Hearst*, 563 F.2d 1331, 1345 (9th Cir. 1977), the court stated "An intrusion by jail officials pursuant to a rule or policy with a justified purpose of imprisonment or

prison security is not violative of the Fourth Amendment." Relying on *Hearst*, the *Pires* court held that the Florida Legislature has clearly set forth a policy placing inmates in the custody and under the control of the Department of Corrections.

A prison's practice of recording inmate telephone calls does not violate the Fourth Amendment. The Fourth Amendment protects only those areas in which there is a legitimate expectation of privacy. *Smith v. Maryland*, 442 U.S. 735 (1979); *Katz v. United States*, 389 U.S. 347, 360 (1967). Numerous courts presented with this precise issue have held as a matter of law that there is no reasonable expectation of privacy in outgoing telephone calls from a prison, even if there is no actual notice that the calls will be intercepted. *United States v. Van Poyck*, 77 F.3d 285, 290-91 (9th Cir. 1996). *See United States v. Amen*, 831 F.2d 373, 379-80 (2nd Cir. 1987); *United States v. Sababu*, 891 F.2d 1308, 1329-30 (7th Cir. 1989); *United States v. Paul*, 614 F.2d 115, 116 (6th Cir. 1980); *United States v. Gangi*, 57 Fed. Appx. 809, 815 (10th Cir. 2003).

In *United States v. Noriega*, 764 F.Supp. 1480, 1492 (S.D. Fla. 1991) the court found with certainty that the defendant had no reasonable expectation of privacy in his conversations because the notices and consent form he signed explicitly stated that his calls were subject to monitoring and recording. *See also United States v. Valencia*, 711 F.Supp. 608 (S.D. Fla. 1989).

In *United States v. Valencia*, 711 F.Supp. 608 (S.D. Fla. 1989), the District Court denied defendants' joint omnibus motion challenging and seeking to suppress recorded jail telephone calls raising Title III and Fourth Amendment concerns. In *Valencia*, the defendants were housed at Metropolitan Correctional Center-Miami and were requested to and did sign consent and waiver forms for telephone use. *Id.* at 609. In the correctional center, inmates are provided with two types of telephones. The first are private phones for inmates to speak with their attorneys; and the second

are phones for general use.  There are multiple lines which are randomly monitored by facility officials.  All calls are recorded and tapes are maintained for a 180 day period unless there is a governmental request to hold the tapes longer.  *Id.* at 609-10. The district court in *Valencia* found that neither Title III nor the Fourth Amendment were violated.  *Id.* at 611-612.

The same rationale applies to this Defendant in this matter.  Defendant cannot claim an expectation of privacy in calls he voluntarily places from a jail phone in an area in which there is a notice posted that the call is subject to recording and monitoring.  "The Fourth Amendment is simply inapplicable to these conversations."  *Noriega* at 1492.

Defendant's calls from the Palm Beach County Jail were legally intercepted and recorded under stated exceptions to federal and state wiretapping laws.  The interception of calls was legally permissible as they were intercepted and recorded for legitimate law enforcement purposes, and all outgoing telephone calls made by inmates - with the exception of those privileged as attorney/client calls - were recorded in the course of ordinary business of the Palm Beach County jail for security, to protect the integrity of the jail and to prevent the commission of state and federal laws.  Moreover, Defendant consented to the telephone calls' being recorded through implication by express written notice posted at the phone that any calls placed from the telephone would be recorded, and by the notices that he received and signed for, notifying him of the monitoring and recording.  In addition, he clearly was aware of the monitoring through his efforts to thwart the detection of his improper three party calls.  Finally, Defendant has no Fourth Amendment violation claim, as there is no expectation of privacy in these recorded telephone calls.

**C.     Defendant's Motion in Limine to Exclude Jail Telephone Conversation and Transcript (DE 47)**

Defendant seeks to exclude the contents of the jailhouse telephone call Defendant made, alleging that the call and transcript are immaterial, irrelevant, prejudicial, misleading and confusing.

Pursuant to FED.R.EVID. 402, all relevant evidence is generally admissible.  Rule 403 provides for the exclusion of relevant evidence, among other reasons, if its probative value is "substantially outweighed" by unfair prejudice.  It is an extraordinary remedy, whose major function is limited to "excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect."  *United States v. Grant*, 256 F.3d 1146, 1155 (11th Cir. 2001) (internal citations and quotations omitted).  Exclusion of otherwise admissible evidence is an extraordinary remedy which the district court should invoke sparingly. *United States v. Finestone*, 816 F.2d 583, 585 (11th Cir. 1987).  To hold otherwise would otherwise allow the court to exclude admittedly probative evidence.  *United States v. Ross*, 33 F.3d 1507 (11th Cir. 1994); *United States v. Elkins*, 885 F.2d 775 (11th Cir. 1989) (On appeal, the court should look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact.).  The term "unfair prejudice" relates to the capacity of some concededly relevant evidence to "lure the factfinder into declaring guilty on a ground different from proof specific to the offense charged.... 'unfair prejudice' means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  *Old Chief v. United States*, 519 U.S. 172 (1997).

Evidence must be much more than simply prejudicial in order to justify the extreme measure of exclusion. *United States v. Terzado-Madruga*, 897 F.2d 1099 (11th Cir. 1990).

Under the provisions of Rule 402, Federal Rules of Evidence, relevant evidence is generally admissible, except where such evidence would be excludable under a separate legal provision.

Evidence is relevant if it has some probative value on the issues of a case. *United States v. Larranaga*, 787 F.2d 489 (10th Cir. 1986). Where evidence has any probative value, the court should favor admission of the evidence. *United States v. Carranco,* 551 F.2d 1197 (10th Cir. 1977).

The party seeking to introduce a sound recording into evidence at trial has the burden of producing foundation evidence demonstrating that "the recording as played is an accurate reproduction of relevant sounds audited by a witness." *United States v. Biggins*, 551 F.2d 64, 66 (5th Cir. 1977).  To establish the foundation the moving party must show: (1) the competency of the operator of the recording equipment; (2) the fidelity of the recording equipment; (3) the absence of material deletions, additions, or alterations in the relevant portions of the recording; and (4) the identity of the relevant speakers. *Biggins*, at 66; *United States v. Lively*, 803 F.2d 1124, 1129 (11th Cir. 1986); *Patterson v. United States*, 444 U.S. 964 (1979).  The trial court has broad discretion in admitting tape recordings and the appeals court is "extremely reluctant" to disturb the trial court's decision. *Biggins*, 551 F.2d at 67. The issue is whether a prima facie showing has been made that the tapes were what the government said they were. *United States v. Scully*, 546 F.2d 255, 269 (9th Cir. 1976); *United States v. Shabazz*, 724 F.2d 1536, 1539 (11th Cir. 1984).

Despite any portions of the brief telephone call which were inaudible or unintelligible to the individual preparing the transcript, the tape is still admissible unless the inaudible portion is so substantial that it renders the recording as a whole untrustworthy.  *Lively*, 803 F.2d 1124; *United States v. Pope*, 132 F.3d 684 (11th Cir. 1998).

If there is a dispute as to the transcript, each side should produce its version and/or each side may introduce evidence supporting the accuracy of its version or challenging the accuracy of the other side's version.  The jury must reconcile the accuracy; therefore, the district court need not

18

listen to the tape or decide whether a transcript is accurate before it is given to the jury and the recording played. *United States v. Hogan*, 986 F.2d 1364, 1376 (11th Cir. 1993).  *See also, United States v. Onori*, 535 F.2d 938, 948 (5th Cir. 1976).

Where a defendant does not submit alternative transcript, he may challenge the accuracy of the government's version through cross examination, but the court may still offer the transcript to the jury with the admonition that the tape is the primary evidence.  *United States v. Garcia*, 854 F.2d 1280 (11th Cir. 1988).

Transcripts are evidence admissible to assist jury in identifying speakers and absent anything more than a generalized claim of prejudice the appellate court will not find error in transcripts being allowed in jury room.  *United States v. Nixon*, 918 F.2d 895 (11th Cir. 1990).

The recorded calls comprise relevant evidence and admissions of Defendant.  The tapes include statements about why the Defendant is in jail, why he allowed the search of the vehicle, why he said the gun was his, how they found the gun despite it being well hidden, how he told the FBI that he had bought the gun, why he put the gun in the compartment, how his fingerprints might be on the gun, and how he would not have signed the form if he knew the FBI was involved, .  They also include a discussion about trying to get the other passenger in the vehicle to take responsibility for the gun.

The recorded conversations of Defendant contains admissions which are most relevant in the prosecution for his possessing a firearm as a convicted felon.  Any prejudice comes from the general nature of the statements sought to be introduced - they are incriminating.  The recordings are not inaudible, nor are the transcripts faulty or misleading.

## RECOMMENDATIONS

For the reasons stated above, this Court makes the following RECOMMENDATIONS regarding the Defendant's motions:

(A) That the **DEFENDANT'S MOTION TO SUPPRESS CUSTODIAL STATEMENT (DE 43)** be DENIED.

(B) That the **DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (DE 41)** be DENIED.

(C) That the **DEFENDANT'S MOTION TO SUPPRESS ALL EVIDENCE DERIVED FROM JAIL TELEPHONE CALLS (DE 46)** be DENIED.

(D) That the **DEFENDANT'S MOTION IN LIMINE TO EXCLUDE JAIL TELEPHONE CONVERSATIONS AND TRANSCRIPTS (DE 47)** be DENIED.

## NOTICE OF RIGHT TO OBJECT

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Senior United States District Judge Kenneth L. Ryskamp within fourteen (14) days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1)(C).  Failure to file timely objections may limit the scope of appellate review of factual findings contained herein.  *See United States v. Warren*, 687 F.2d 347, 348 (11th Cir.1982), *cert. denied*, 460 U.S. 1087 (1983).

**DONE** and **SUBMITTED** in Chambers at West Palm Beach in the Southern District of

Florida, this 16 day of March, 2010.


*James M. Hopkins*

_____
JAMES M. HOPKINS
UNITED STATES MAGISTRATE JUDGE


Copies to:
Hon. Kenneth L. Ryskamp
Counsel of record